


EXHIBIT 2

# MARINE FUELS

## TERMS AND CONDITIONS OF SALE

PUBLICATION DATE: 1 JULY 2020



## 1. DEFINITIONS

Throughout these Terms and Conditions of Sale ("**Terms and Conditions**"), save where the context requires, the following definitions shall apply:

| | |
|---|---|
| "**Abatement Technology**" | means any fitting, material, appliance, apparatus or other procedures undertaken, or compliance methods used by the Vessel as an alternative to comply with its obligations in Regulation 4 of MARPOL Annex VI. |
| "**Barge**" | means the marine vessel(s) used by the Physical Supplier to carry out the supply of Marine Fuels to a Vessel. |
| "**BDN**" | means a bunker delivery note or receipt for any Marine Fuels supplied by the Physical Supplier for each separate delivery under a Contract. |
| "**Buyer**" | means the buyer of Marine Fuels named or referred to in the applicable Confirmation. |
| "**Confirmation**" | means the written confirmation note issued by the Seller to the Buyer, setting out the specific details and additional terms of a Contract. |
| "**ETA**" | means the estimated date(s) of arrival of a Vessel at a given location for each delivery, as set out in the applicable Confirmation. |
| "**Marine Fuels**" | means products derived from crude oil, mineral or synthetic lubricating oils or greases, more particularly described in the applicable Confirmation. |
| "**MARPOL Annex VI**" | means RESOLUTION MEPC.176(58) Amendments to the Annex of the Protocol of 1997 to amend the International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocol of 1978 relating thereto (Revised MARPOL Annex VI). |
| "**Physical Supplier**" | means the entity carrying out the physical supply of Marine Fuels to a Vessel. |
| "**Price Validity Window**" | means the period commencing one (1) day prior to the earliest date of the Vessel's ETA and ending one (1) day after the earliest date of the Vessel's ETA. |
| "**Road Vehicle**" | means the road vehicle used by the Physical Supplier to carry out the supply of Marine Fuels to a Vessel. |
| "**Seller**" | means the Seller of Marine Fuels named in the applicable Confirmation. |
| "**Seller Affiliate**" | means any body corporate owned or controlled by the same ultimate beneficial owner as the Seller. |
| "**Seller Group**" | means the Seller and all Seller Affiliates. |
| "**Vessel**" | means the marine vessel nominated by the Buyer to receive Marine Fuels delivered by the Physical Supplier, as set out in the applicable Confirmation. |

## 2. APPLICABILITY OF THE TERMS AND CONDITIONS

a) These Terms and Conditions, in conjunction with the applicable Confirmation, shall constitute the contract ("**Contract**") pursuant to which the Seller agrees to sell and procure delivery of Marine Fuels, and the Buyer agrees to accept and pay for such Marine Fuels. The Buyer expressly agrees that it will incur a debt obligation to the Seller for any amounts owed pursuant to that Contract from the time of delivery of such Marine Fuels, irrespective of whether an invoice is issued for such amounts, and where the Buyer wrongfully neglects or refuses to pay any such amounts in accordance with the Contract, the Seller may maintain an action against the Buyer for any such amounts.

b) Each Contract contains the entire agreement between the Buyer and the Seller and shall supersede all prior agreements, arrangements or stipulations whether oral or written, for the supply of Marine Fuels contemplated in that Contract. In the event of any conflict or inconsistency between the provisions of the Confirmation and these Terms and Conditions, the provisions of the Confirmation shall prevail.

c) Documentation issued by the Buyer, the Vessel (or any of their respective representatives) including but not limited to any purchase order, nomination or confirmation, shall in no way bind the Seller or vary the terms of the Contract. The Contract can only be amended or varied by written agreement of both the Buyer and the Seller and any attempt to do otherwise shall be null and void.

d) If the delivery is contracted for by the Buyer as an agent of any other person, or by any person as an agent of the Buyer, whether such agency is disclosed or not, such agents and principals shall be jointly and severally liable with the Buyer for all obligations expressed to be those of the Buyer under the Contract and for the due and proper performance of the Contract.



### 3. NOMINATION

a) The Seller shall not issue a Confirmation unless: (i) it decides in its absolute discretion to do so; and (ii) it first receives an email from the Buyer containing the following information relating to a proposed delivery (a "**Nomination**"):

    a. the name of the Vessel;
    b. the name and contact details of the operator of the Vessel;
    c. the proposed delivery location for the Vessel;
    d. any specific delivery conditions required by the Buyer or the Vessel;
    e. the grades and quantities of Marine Fuels to be delivered to the Vessel;
    f. the time when the Vessel is expected to be ready for delivery;
    g. the name and contact details of the Vessel's agent at the delivery location;
    h. the Buyer's company details (full style) and invoicing address;
    i. any factor which could, in the reasonable opinion of the Seller, prejudice the Seller's rights under clause 10;
    j. any specific or unusual characteristics of the Vessel which may, in the reasonable opinion of the Seller, prejudice the Physical Supplier's ability to deliver Marine Fuels to it; and
    k. such other information as the Seller may reasonably request.

b) In providing a Nomination to the Seller, the Buyer hereby represents and warrants that it is familiar with and understands all limitations and conditions affecting the delivery location and shall inform the Seller of such limitations and conditions. The Buyer shall only nominate a Vessel that is compatible with such limitations and conditions. The Buyer further represents and warrants that any Vessel it nominates is operating in compliance with all applicable laws, regulations and other requirements of: (i) the country of the Vessel's registry; and (ii) the relevant authorities (including port authorities or terminal operators) at the delivery location.

c) Where the Buyer nominates Marine Fuels that are above the sulphur limits set out in MARPOL Annex VI, the Buyer must provide confirmation in writing that is to the satisfaction of the Seller, with its Nomination that the Vessel has working Abatement Technology installed in compliance with MARPOL Annex VI (the "**Abatement Technology Notification**").

d) Where the Buyer nominates fuel oil with a maximum sulphur content of 0.50% ("**VLSFO**") and/or fuel oil with a maximum Sulphur content of 0.10% ("**ULSFO**"), the Buyer shall be deemed to warrant and represent that the Vessel's receiving tanks: (i) have been sufficiently cleaned and prepared to receive the VLSFO and/or ULSFO; and (ii) that following such cleaning and preparation of the Vessel's receiving tanks, no other marine fuels above the limits in MARPOL Annex VI have been stored, or will be stored in the Vessel's receiving tanks.

e) Where the Buyer nominates Marine Fuels above the sulphur limits set out in MARPOL Annex VI I without an Abatement Technology Notification, such Nomination must include a copy of a valid Fuel Oil Non-Availability Report (FONAR) and the relevant authorisation granted to the Vessel for that specific delivery of Marine Fuels.

f) The Buyer shall indemnify and keep indemnified the Seller against all actions, claims, proceedings, costs and damages and all legal costs or other expenses arising out of or in connection with any inaccuracy of the representations and/or breach of the warranties above or out of any claim by a third party based on any facts which, if substantiated, would constitute such a breach.

### 4. PRICE

a) The price of the Marine Fuels shall be stated in the Confirmation.
b) The price of the Marine Fuels excludes, and the Buyer shall be liable to pay, any and all additional costs incurred in connection with the delivery, including but not limited to:

    (i) all foreign or domestic VAT, GST, excise and/or similar taxes, duties, tolls, fees, imposts or other charges, imposed by any taxing authority on the Buyer, the Seller or any Seller Affiliate relating to the sale, inspection, storage or use of Marine Fuels, except for taxes on Seller's income; and

    (ii) delivery costs applicable for the date of delivery including mooring fees, wharfage fees, barging fees, barge demurrage, provision of additional hoses and the use of oil pollution control equipment, in each case as determined in the sole discretion of the Seller.

c) If the price is quoted in volume units, conversion to standard volume shall be at 60 degrees Fahrenheit or 15 degrees Celsius.
d) Subject to clause 18, or unless otherwise stated in the Confirmation, the price of the Marine Fuels shall be given in United States Dollars.



### 5. GRADES

a) The Buyer hereby warrants that it has not relied upon any representations made by or on behalf of the Seller but has relied exclusively on its own knowledge and judgment as to the fitness for its purpose of the Marine Fuels ordered. The Buyer shall be solely responsible for nominating to the Seller the grade of Marine Fuels for each delivery. All other representations, warranties, guarantees and all conditions relating to quality, compatibility of the Marine Fuels with any other marine fuels onboard the Vessel, fitness for purpose, description or otherwise, whether express or implied by common law, statute or otherwise are hereby excluded.

b) The Marine Fuels supplied pursuant to each Contract shall be:
  (i) in accordance with the grade and/or specification stated in the Confirmation; or
  (ii) where a grade and/or specification of the Marine Fuel is not stated in the Confirmation, the grade and/or specification (as the case may be) of the Marine Fuel supplied under each Contract shall be those generally available to the Physical Supplier at the time of each delivery at the delivery location.

### 6. REQUESTS TO AMEND DELIVERY AND CANCELLATION

a) If the Seller suspends a delivery in accordance with clause 7(h), the Vessel arrives outside the Price Validity Window, the Buyer requests delivery to begin outside the Price Validity Window, the Buyer fails to provide an Abatement Technology Notification or Fuel Oil Non-Availability Report in accordance with clause 3, or if the Buyer requests a change in the delivery mode, then in each case the Seller shall not be obliged to perform the delivery and shall be entitled in its sole discretion to:
  (i) amend the price set out in the applicable Confirmation to take account of increased or additional costs, including but not limited to any increase in delivery costs and/or prevailing market prices; or
  (ii) terminate the Contract with immediate effect upon notice to the Buyer, and the Buyer shall indemnify the Seller in accordance with clause 6(b).

b) If: (i) the Seller terminates the Contract in accordance with clauses 6(a) and/or 18(d)(i); (ii) the Buyer purports to cancel or terminate the Contract (other than pursuant to clause 13(d)); (iii) the Buyer otherwise fails to take delivery, in whole or in part, of the quantities of Marine Fuels as specified in the Confirmation; or (iv) the Buyer fails to pay for the Marine Fuels as specified in the Contract, then in each case (without prejudice to any other rights or remedies which the Seller has under the Contract or at law) the Buyer, shall be liable to the Seller for any and all direct or indirect or consequential losses incurred by the Seller resulting from such purported cancellation, termination or failure, including but not limited to:

  a. any charges and expenses levied by a third party (including any Physical Supplier); b. any difference in price between the Contract price and the market price at the delivery location on the date of such purported cancellation, termination or failure; c. losses, costs and damages associated with terminating, liquidating, obtaining or re-establishing any hedging arrangement, derivative transactions or related trading position; d. costs of selling any undelivered Marine Fuels; e. additional operational expenses such as pump-back fees, inspection charges and storage; and f. demurrage.

### 7. DELIVERY

a) For each delivery, the Buyer (or the Buyer's representatives at the delivery location), shall give the Seller (and the Seller's representatives at the delivery location) seventy-two (72), forty-eight (48) and twenty-four (24) hours prior written notice of the Vessel's arrival. The Buyer shall notify the Seller immediately of any change in the Vessel's expected arrival time. The notices given by the Buyer under this clause 7(a) are for the Seller's information only and shall not amend the terms of the Contract.

b) Unless otherwise agreed by the Seller, the mode of delivery for the Marine Fuel shall be in the Seller's option and deliveries shall take place within the customary bunkering location and during the normal working hours of the delivery port. Where deliveries occur outside the customary bunkering location or outside the normal working hours of the delivery port the Buyer shall be liable for any additional delivery costs.

c) If the Vessel arrives at the delivery location prior to the ETA, delivery of the Marine Fuel may take place at the Seller's sole discretion, but the Seller shall be under no obligation to supply (or procure the supply of) the Vessel prior to the ETA, and the Seller accepts no liability for failure to do so. Upon or following the ETA, the Physical Supplier shall deliver the Marine Fuels as soon as reasonably practicable, subject to any event or circumstance including but not limited to public holidays, port holidays, customary non-business days of the delivery location, applicable regulations of the delivery location, any congestion affecting the delivery location or the delivery facilities and any prior commitments of Barges or Road Vehicles.

d) The Seller shall in no circumstances be liable for any costs, losses or expenses incurred by or relating to the Vessel and/or the Buyer in relation to the time taken to commence and/or complete the delivery of the Marine Fuels, including



but not limited to delays, demurrage, detention, loss of hire or freight, and/or Vessel operating costs, whether caused by the Physical Supplier, the Buyer, the Vessel or otherwise.

e) The Buyer warrants at the time of delivery that the Vessel: (i) can safely receive the Marine Fuels; (ii) has all the certificates required to comply with all relevant regulations relating to the delivery of Marine Fuels at the delivery location; and (iii) is entered with a P&I Club which is a member of the International Group of P&I Clubs and maintains H&M insurance for the Vessel's full declared value and maintains pollution coverage for the Vessel commensurate with coverage for similar vessels in the trade.

f) The Buyer shall be responsible for providing: (i) a free side for the delivery; (ii) safe passage between the Vessel and the Barge, Road Vehicle or other delivery facilities; and (iii) safe reception of the full quantity of Marine Fuels contracted for without risk to the Physical Supplier, any agent, employee or supplier of the Physical Supplier or to the property of any such party. The Buyer shall ensure that the Vessel has sufficient tankage and equipment to receive the Marine Fuels promptly and safely, and shall be responsible for making all connections and disconnections between the delivery hose(s) and the Vessel's intake pipe and shall ensure the hose(s) are properly secured to the Vessel's manifold prior to commencement of delivery.

g) Any bunker surveyor appointed by the Buyer or the Vessel to attend the delivery of the Marine Fuel must be duly approved by the relevant authorities in the delivery location. Attendance of any bunker surveyor appointed by the Buyer or Vessel is subject to the prior agreement of the Seller and the Seller accepts no liability whatsoever (including but not limited to liability for any delay) for any withholding of such approval. Any such bunker surveyor shall be deemed to be a representative of the Buyer.

h) If in the Seller's or the Physical Supplier's opinion the Vessel cannot safely receive the Marine Fuels (or in the opinion of the Seller, the Buyer and/or the Vessel is not acting in compliance with MARPOL Annex VI, or any other applicable laws or regulations), the Seller has the option to either (i) suspend the delivery until, in the Seller's or Physical Supplier's opinion, the Vessel can safely receive the Marine Fuels and/ or is in compliance with MARPOL Annex VI, and/or (ii) terminate the delivery or the Contract. Any such suspensions that result in the delivery commencing outside of the Price Validity Window shall be subject to clause 6.

i) Any addition to or deletion from the BDN by either the Buyer, or the Vessel (or any of their representatives) shall have no validity under the Contract.

j) The Buyer shall indemnify the Seller in respect of any delays or losses incurred by the Barge, Road Vehicle or other delivery facilities in connection with the Contract, including but not limited to any delay, refusal or failure by the Buyer to: (i) sign the BDN, and/or (ii) disconnect the delivery hose(s).

k) Delivery of the Marine Fuels under the Contract shall be deemed completed on the issuance of the last BDN by the Physical Supplier ("**Completion**").

## 8. MEASUREMENT, QUANTITY AND TOLERANCE

a) Subject to any mandatory requirements at the delivery location, the Physical Supplier (or its representative) shall take measurements of the volume and calculations of the quantity of each grade of the Marine Fuels delivered ("**Measurements**"), and such Measurements shall (in the absence of fraud or manifest error) be final and binding on the parties of the quantity delivered. The Buyer, the Vessel or their representatives shall be entitled to witness such Measurements.

b) Any claim by the Buyer for incorrect Measurements shall be waived and absolutely barred unless: (i) the Buyer, the Vessel or their representatives have witnessed the taking of such Measurements and issued a letter of protest on the date of Completion detailing the claim; and (ii) the Buyer subsequently presents such claim to the Seller in writing (together with full supporting documentation evidencing that the Measurements are incorrect) within fifteen (15) days from (and including) the date of Completion.

c) Subject to clause 8(d), if the quantity of each grade of Marine Fuels delivered by the Physical Supplier is greater or less than the quantity of that grade of Marine Fuels set out in the applicable Confirmation (and such difference cannot be attributed to incorrect Measurements), the Buyer, the Vessel or their representatives must issue a separate letter of protest on the date of Completion detailing the claim. Following the issue of the letter of protest, any claim for over or under delivery shall subsequently be presented by the Buyer to the Seller in writing (together with full supporting documentation evidencing the applicable over or under delivery) within fifteen (15) days from (and including) the date of Completion, failing which any such claim shall be waived and absolutely barred (and in such case the Buyer shall be deemed to have accepted the quantity of Marine Fuels delivered).

d) Any quantity of each grade of Marine Fuels set out in a Confirmation shall be subject to an operational tolerance of +/- 5% in the Seller's option (the "**Tolerance**"). If the quantity of Marine Fuels delivered by the Physical Supplier is greater or less than the quantity set out in the Confirmation (but only within the amount of the Tolerance) the Buyer is bound to accept and pay for the actual delivered quantity at the price set out in the Confirmation. Where the price set out in the Confirmation is a lump sum, the price will be adjusted on a pro-rata basis to reflect the actual delivered quantity.



## 9. SAMPLING AND QUALITY

a) In relation to each delivery, subject to any mandatory requirements at the delivery location, the Seller shall procure that the Physical Supplier (or its representative) shall take a minimum of three (3) samples of each grade of the Marine Fuels. All such samples shall be drawn from the Barge, Road Vehicle or other delivery facility manifold unless the Physical Supplier elects otherwise. Each such sample shall be:
   (i) securely sealed;
   (ii) labelled with the Vessel's name, product type, delivery date, delivery location and seal number;
   (iii) authenticated with the Vessel's stamp;
   (iv) signed by the Physical Supplier and the Master of the Vessel (or any of their authorised representatives); and
   (v) recorded on the BDN.

   At least one (1) sample shall be retained by the Physical Supplier (the "**Supplier Retained Sample**") and two (2) samples shall be passed to the Buyer, the Vessel or their representatives (the "**Vessel BDN Samples**") for its retention (the "**Sampling Procedure**").

b) The Buyer, the Vessel or their representatives shall have the right to witness the Sampling Procedure. Their failure to do so, for any reason, shall not prejudice the validity of the Sampling Procedure. In the event of such failure to witness the Sampling Procedure, the Buyer shall be deemed to have waived any claim as to the validity of the Sampling Procedure or that the Supplier Retained Sample(s) are not representative of the Marine Fuel supplied.

c) Where the Seller is the Physical Supplier, it shall retain the Supplier Retained Sample(s) for a minimum of fifteen (15) days, from (and including) of the date of Completion, unless a claim is brought by the Buyer to the Seller in accordance with clause 9(d), in which case it shall retain such Supplier Retained Sample(s) until the claim has been resolved.

d) Any claim in respect of the quality of the Marine Fuels must be notified to the Seller in writing within fifteen (15) days from (and including) the date of Completion, failing which such claim shall be waived and absolutely barred. Such claims must include an analysis of a sample of the Marine Fuels carried out in accordance with the relevant test method in ISO 8217 by a qualified independent laboratory. If the sample analysis results are within the recipient confidence limit in ISO 4259 (or any subsequent amendments to it), the Marine Fuels shall be considered to be on-specification. The Buyer shall provide a separate analysis of a Vessel BDN Sample (from a laboratory to be mutually agreed) if requested by the Seller.

e) If a quality claim complies with the foregoing provisions in this clause 9, the Seller shall arrange for the specific alleged off-specification parameter(s) of a Supplier Retained Sample to be analysed at an ISO certified independent inspection company (the "**Test**"). Where the parties do not agree on the choice of inspection company and/or location of laboratory for the Test the Seller is entitled to choose at its sole discretion. The Buyer (or its representative) may at the Buyer's cost witness the entire Test and/or the breaking of the seal but failure by the Buyer to do either will in no way prejudice the validity or results of the Test.

f) The results of the Test shall be conclusive as to the quality of the Marine Fuels and final and binding on the Buyer and the Seller. The results shall be considered as a single result when interpreted in accordance with ISO 4259 (or any subsequent amendments to it). If the Marine Fuels are determined to be off-specification the Seller shall be liable for the costs of the Test, in all other circumstances the Buyer shall be liable and shall indemnify the Seller in respect of such costs.

g) Samples drawn by the Buyer, the Vessel or their representatives shall have no relevance whatsoever in determining the quality of the Marine Fuels delivered.

## 10. RISK AND TITLE

a) Risk in the Marine Fuels shall pass to the Buyer as the Marine Fuels pass the last permanent flange connecting the Barge, Road Vehicle or other delivery facility manifold with the Vessel.

b) The Seller shall retain title to the Marine Fuels until the Seller has received full payment for the Marine Fuels and any other amounts and debts howsoever arising owed by the Buyer to the Seller. Until receipt of such payments the Buyer agrees that it is in possession of the Marine Fuels solely as bailee for the Seller, and shall not be entitled to:
   (i) use the Marine Fuels other than for the propulsion or operational maintenance of the Vessel; or
   (ii) blend, encumber, pledge, alienate, or surrender the Marine Fuels to any third party or other vessel

c) Marine Fuels delivered pursuant to the Contract are sold and delivered on the financial credit of the Vessel as well as on the promise of the Buyer to pay. The Buyer therefore expressly warrants and agrees that:
   (i) the Marine Fuels are delivered with the authorisation and on behalf of the Vessel, its registered owner, its Master, the charterers and/or agents of the Vessel;
   (ii) there is no provision contained in the applicable Vessel's charterparty (or similar contractual arrangement) which purports to limit the Vessel, its Master, the charterers and/or agents or representatives of the Vessel from incurring a maritime lien;



(iii) in addition to any other parties that may be listed as Buyer in the Confirmation, the Vessel and its registered owner are jointly and severally liable for payment of the Marine Fuels; and

(iv) until the payments referred to in clause 10(b) above have been received in full by the Seller, the Seller shall have a maritime lien, attachment and/or claim against the Vessel and/or the Marine Fuels delivered. Such maritime lien, attachment and/or claim shall be without prejudice and in addition to any other remedy available to the Seller. The Buyer shall not do anything nor enter into any agreement that will in any way prejudice the Seller's right or ability to assert or enforce any such maritime lien, attachment and/or claim. If the Marine Fuels have been commingled on board the Vessel, the Seller retains its right of maritime lien, attachment and/or claim against the Vessel and/or against such part of the commingled marine fuel as corresponds to the quantity of the Marine Fuels delivered.

d) "No-Lien" stamps (or any similar notification which could prejudice the Seller's rights under clause 10(b) and (c)) on any document including to the BDN, whether used by the Buyer, the Vessel (or its representatives) or any third party shall not vary the terms of the Contract, and shall in no way prejudice any right of lien, attachment and/or claim the Seller has against the Buyer, the Vessel, the Vessel's registered owner or the Marine Fuels.

## 11. HEALTH, SAFETY AND THE ENVIRONMENT

a) The Buyer shall provide its employees and the Vessel with all relevant health, safety and environmental information concerning the Marine Fuels (including any Material Safety Data Sheets provided by the Physical Supplier). The Buyer shall ensure that its employees and the Vessel shall comply fully with all requirements, obligations and recommendations relating to the handling and use of the Marine Fuels.

b) The Seller shall not be responsible in any respect whatsoever for any loss, damage or injury resulting from the Buyer's or the Vessel's failure to account for any hazards inherent in the nature of any marine fuels.

c) The Buyer shall at all times comply with any obligations, requirements or recommendations contained in any law, statute directive or regulation of any territory, state or jurisdiction in or through which the Marine Fuels may be delivered, sold, transported or used and all government, state or local regulations at the delivery location including but not limited to those related to fire, transportation, handling, storage, spillage or loss of marine fuels. Compliance by the Buyer with the obligations referred to in clause 11(a) shall not excuse the Buyer from its obligations under this clause 11(c).

d) If a spill of Marine Fuels occurs during a delivery and/or at any point after Completion where the Seller retains title to the Marine Fuels the Buyer shall immediately take all action reasonably necessary to remove the spillage and mitigate its effects. If the Buyer fails to do so, the Seller and/or the Physical Supplier may, at its option, take such measures it considers to be required in connection with the removal of the spillage and the mitigation of its effects. The Buyer shall indemnify the Seller against all liability, costs and expenses (including but not limited to those incurred by the Physical Supplier) arising from or in connection with any spillage except to the extent that such spillage has been caused solely by the negligence of the Physical Supplier or failure of or defect in the Physical Supplier's equipment. Where both parties have acted negligently, the Buyer shall only indemnify the Seller in accordance with its respective degree of negligence. The Buyer shall promptly provide the Seller with any requested documents and information regarding a spill including the Vessel's spill contingency plan or any other applicable program for the prevention or mitigation of pollution as required by any applicable laws or regulations.

e) The Buyer shall indemnify and keep indemnified the Seller against any liability, claim or proceedings whatsoever arising out of or in connection with any failure by the Buyer to comply with its obligations under this clause 11.

## 12. LIABILITY

a) Where the Contract provides for a single delivery of Marine Fuels, the Seller's liability for breach of the Contract shall not exceed the invoice value of the Marine Fuels delivered pursuant to that Contract. Where the Contract provides for more than one delivery of Marine Fuels, the Seller's liability shall not exceed the invoice value of the Marine Fuels delivered pursuant to each separate delivery under it.

b) The Buyer shall indemnify the Seller and hold it harmless in respect of any losses, claims, liabilities, damage, penalties, fines, expenses and costs (inclusive of interest) arising from the delivery of the Marines Fuels (including but not limited to the Buyer and/or the Vessel's failure to comply with MARPOL Annex VI), except where such losses, claims, liabilities, damage, penalties, fines, expenses and costs are caused by the Seller's negligence or breach of the Contract.

c) If the Marine Fuels delivered do not meet the specification set out in the Contract the Buyer shall take all reasonable actions to mitigate potential losses, including but not limited to the blending of the Marine Fuels in accordance with the Seller's instructions.

d) Where, following completion of any actions pursuant to clause 12(c), the Marine Fuels continue not to meet the specification set out in the relevant Contract, subject always to clause 12(a), the Buyer's remedies shall be limited to:

(i) the de-bunkering of the Marine Fuels to be arranged by the Seller at a mutually agreed location;

(ii) reimbursement for or replacement of such Marine Fuels by the Seller at its option; and



(iii) the reasonable and verifiable repair or replacement costs (accounting for depreciation) of any components of the Vessel that are physically damaged as a direct result of using such Marine Fuels. Any components of the Vessel that are physically damaged shall be retained on board the Vessel, or as otherwise agreed with the Seller, for inspection by the Seller's representatives.

Should the Buyer remove the Marine Fuels without the prior consent of the Seller, all costs arising as a result of such removal shall be on the Buyer's account.

Should the Buyer dispose of any damaged components prior to the inspection by the Seller's representative in accordance with this clause 12(d)(iii), all costs arising as a result of such damage and all costs incurred in the repair or replacement of such components shall be for the Buyer's account.

e) In no circumstances shall the Seller:
   (i) have any obligation to make any payment to the Buyer under this clause 12 until the Seller has received full payment from the Buyer of all sums due to the Seller (howsoever arising);
   (ii) be liable for any claim in connection with a supply of Marine Fuels which has been commingled with any other substance;
   (iii) have any liability, whether as a result of a breach of the Contract, negligence or otherwise, and whether as a result of the acts or omissions of the Seller, its servants, agents, subcontractors or any fraudulent acts or omissions of the Physical Supplier (where the Physical Supplier is a third party), for any loss of actual, projected, prospective or anticipated profit, loss of time or hire, cost of overheads thrown away, fuel consumption, demurrage, detention or loss of schedule, cost of deviation, cost of substitute vessel(s), loss related to the loss of operational use of the Vessel, physical loss, damage to cargo, cost of any tank or any equipment cleaning, loss of contract(s) or economic loss, in each instance whether such losses are direct, consequential or otherwise nor, without prejudice to the foregoing, shall the Seller be liable for any consequential, indirect, punitive, exemplary, incidental or special losses, damages or expenses suffered by the Buyer.

## 13. FORCE MAJEURE

a) A party shall not be deemed to be in breach of the Contract or to be liable to the other party for any failure, omission or delay in its performance in whole or in part under the Contract (except in relation to any obligation to make payment) if such failure, omission or delay was not reasonably foreseeable by that party at the time each applicable Confirmation is issued by the Seller to the Buyer and arises or results from any cause not reasonably within the control of that party, including but not limited to such causes as:
   (i) government intervention, compliance with any law, regulation or ordinance, or with any order, demand or request of any international, national, port, transportation, local or other authority or person purporting to act with such authority, or agency or any other corporation directly or indirectly controlled by any of them; or
   (ii) natural disaster, earthquake, flood, storm, epidemic or pandemic, fire, explosion, damage to any terminal or port, or any act of God; or
   (iii) labour or trade disputes, strikes, industrial action or lockouts; or
   (iv) war, threat of or preparation for war, armed conflict, military operations, terrorism actions, civil war, embargo, blockade, riot or civil commotion;

any such event being hereinafter referred to as a "**Force Majeure Event**". Prompt written notice of the Force Majeure Event shall be given by the party so affected.

b) In addition to clause 13(a), the Seller shall not be in breach of the Contract or be liable to the Buyer for the unavailability of supplies of Marine Fuels from any of the Seller's sources of supply (including but not limited to the Physical Supplier) insofar as such unavailability is related to a circumstance which is outside the reasonable control of the Seller.

c) If any Force Majeure Event, or any event described in clause 13(b) occurs, then the Seller shall be at liberty to withhold, reduce, suspend or cancel delivery of Marine Fuels under the Contract to such extent as the Seller may in its absolute discretion determine and the Seller shall not be bound to acquire any additional or alternative Marine Fuels.

d) Where the Force Majeure Event continues for a period of five (5) consecutive days following the written notice of the Force Majeure Event (the "**Force Majeure Period**"), either party may then terminate the delivery of Marine Fuels pursuant to the applicable Confirmation by further written notice to the other. Such termination shall not give rise to any liability, compensation or indemnity of any kind, other than any liabilities arising prior to the Force Majeure Event.

## 14. PAYMENT TERMS

a) Payment by the Buyer for any sums due to the Seller under the Contract shall be made in full (without any deduction, set-off or counterclaim whatsoever, free of bank charges and in cleared funds) by telegraphic transfer, automated credit transfer or electronic transfer of same day funds quoting the Seller's invoice number and the Buyer's name.



b) Unless otherwise stated in the Confirmation, payment shall be due by the Buyer to the Seller on the date of Completion. If a credit period has been granted by the Seller to the Buyer in the Confirmation (the "**Credit Period**"), the transfer of the funds shall be made and value dated by the Buyer, no later than the expiry date of that Credit Period. If, however, the Buyer's or the Seller's bank is closed for business on the last day of the applicable Credit Period the Buyer shall make its payment by the last day within such Credit Period when such banks are open for business. All bank charges in respect of such payments shall be for the Buyer's account.

c) The Buyer shall notify (or shall instruct its bank to notify) the Seller as soon as a payment has been made quoting the date on which such payment was made, the amount, the name of the bank effecting payment and details of each invoice to which the payment relates. The Buyer's payment obligations under the Contract shall be discharged only when the Seller has received payment in full for any amounts due and payable to the Seller pursuant to the Contract (including any interest).

d) If, at any time following the entry into the Contract: (i) the Buyer's financial position and/or credit worthiness is deemed by the Seller (in its opinion) to be impaired or unsatisfactory; or (ii) the Seller Group's aggregate financial exposure under any contracts to the Buyer and its affiliates ("**Buyer Group**") exceeds the credit limit set by the Seller Group at the time; or (iii) the Seller becomes aware of any factor which (in its opinion) could prejudice the Seller's rights under clause 10, the Seller may, without prejudice to its other rights, require the Buyer to:
   a. pay cash before the delivery of Marine Fuels for any future deliveries; and/or
   b. provide security satisfactory to the Seller which can cover both future deliveries and deliveries made but not yet paid for; and/or
   c. effect immediate payment of any outstanding amounts due from the Buyer Group to the Seller in respect of the Contract or any other contract between any of the Seller Group and the Buyer Group (notwithstanding any credit period set out in such contract).

e) If the Buyer fails to comply with this clause 14 in respect of the Contract, the Seller shall have no obligation to make any delivery of Marine Fuels to the Buyer and/or Buyer Group under any other contract, and:
   (i) may terminate all other contracts between the Seller and the Buyer and/or Buyer Group immediately on giving notice to that effect to the Buyer; or
   (ii) may cancel any credit period under any other contract between the Seller and the Buyer and/or Buyer Group and require that the Buyer make immediate payment of any amounts due under any other contract.

f) Without limitation to any of the Seller's rights, for any payments not made by the Buyer when due, the Buyer shall be liable to pay the Seller interest at two (2) per cent per thirty (30) day period, and pro rata for any part thereof. Interest shall be calculated from the payment due date until the date payment is received in full by the Seller.

g) Payments made by the Buyer shall at all times be credited by the Seller to meet outstanding amounts due from the Buyer in the following order:
   (i) costs;
   (ii) interest; and
   (iii) invoices in order of their age.

## 15. TERMINATION IN THE EVENT OF INSOLVENCY

a) Notwithstanding anything to the contrary express or implied, the Seller (without prejudice to its other rights) may at its sole discretion immediately suspend delivery under and/or terminate the Contract and any and all other contracts between the Seller and the Buyer and/or Buyer Group by notice to the Buyer if the Buyer:
   (i) is dissolved;
   (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due;
   (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors;
   (iv) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditor's rights, or a petition is presented for its winding-up or liquidation and is not withdrawn, dismissed, discharged, stayed or restrained within the time period required by the Seller in its absolute discretion;
   (v) has a resolution passed for its winding-up, official management or liquidation;
   (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets;
   (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets;
   (viii) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in this clause 15; or
   (ix) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts referred to in this clause 15.

b) The termination of the Contract by the Seller under this clause 15 shall not affect in any way any of the Seller's rights and the Buyer's obligations under the Contract or any other contracts between the parties which were created, incurred or contracted prior to such termination by the Seller.



16. **NOTICE**

Any notice by either party to the other must, unless otherwise agreed, be made in writing, and can be sent by courier, registered post, email or fax. Any requisite address and/or contact details of the Buyer should be specified in the Nomination and/or the Confirmation. Any notice received after 18:00 hours on a normal business day in the location of receipt shall be deemed not to have been given until the next business day in that location.

17. **NON-PHYSICAL SUPPLY**

   a) In circumstances where the Seller is not the Physical Supplier, and where the Seller (or any Seller Affiliate) is purchasing the Marine Fuels from a third party (the "**Third Party**"), the terms and conditions of the sale and purchase contract between the Seller and the Third Party (the "**Third Party Terms**") shall be deemed to be incorporated into the Contract to the extent expressly set out in this clause 17 and the Buyer shall be deemed to have read and accepted the applicable provisions within the Third Party Terms, whether or not the Third Party is the Physical Supplier.
   b) Subject to clause 17(c), if the Third Party Terms contain:
      (i) a shorter time limit for the doing of any act (other than termination of the Contract), or the notification of any claim, then such shorter time limit shall be deemed incorporated mutatis mutandi into these Terms and Conditions;
      (ii) different measurement, sampling, sample retention or testing procedures in relation to the Marine Fuels being delivered pursuant to the Contract, then such measurement, sampling or testing procedures shall be incorporated into these Terms and Conditions;
      (iii) any additional limitation or exclusion of liability provision, then such provision shall be deemed incorporated mutatis mutandi into these Terms and Conditions providing they shall apply to further limit the liability of the Seller only;
      (iv) any additional event or circumstance that constitutes Force Majeure, any wider definition of what constitutes Force Majeure, or any more restrictive Force Majeure Period (or analogous definition), then such event, circumstance or definition shall be incorporated mutatis mutandi into these Terms and Conditions;
      (v) any greater tolerance relating to quantity of Marine Fuels to be delivered, then such tolerance shall be incorporated mutatis mutandi into these Terms and Conditions; and
      (vi) any additional termination rights which would apply to the Seller, then such rights shall be incorporated mutatis mutandi into these Terms and Conditions.
   c) Notwithstanding the above, any express or implied right, condition or obligation in the Third Party Terms that would afford the Buyer any additional rights against the Seller than those set out in these Terms and Conditions shall not be deemed incorporated under any circumstances.
   d) A copy of the relevant provisions from the Third Party Terms that are deemed to be incorporated into the Contract shall be made available to the Buyer by the Seller upon request by the Buyer.

18. **SANCTIONS COMPLIANCE**

   a) The Buyer warrants and represents that the Vessel is employed at all times in full compliance with all trade sanctions, foreign trade controls, export controls, non-proliferation, anti-terrorism and similar laws, regulations, decrees, ordinances, orders, demands, requests, rules or requirements issued or enacted by the United States of America, the United Nations, the European Union and/or Singapore ("**Trade Sanctions**").
   b) In particular, the Buyer warrants and represents that:
      (i) neither the Buyer nor the Vessel are included on the Specially Designated Nationals and Blocked Persons List published and amended from time to time by OFAC or the equivalent lists published by the European Union and Singapore (collectively, "**Sanctions List(s)**");
      (ii) neither the Buyer nor the Vessel are owned or controlled or acting for or on behalf of any individual or entity which is included on any Sanctions List;
      (iii) no individual or entity with any interest in any cargo on board the Vessel is included on any Sanctions List; and
      (iv) every cargo carried on board the Vessel can be loaded, carried and discharged without infringing any Trade Sanctions.
   c) The Buyer shall, as soon as possible, at the request of the Seller, provide bills of lading, seaway bills or other applicable documentation evidencing carriage of any cargo on board the Vessel.
   d) If in the reasonable opinion of the Seller the Buyer's warranties under clause 18(a) or (b) are inaccurate, the Buyer fails to provide relevant documentation under clause 18(c), or there is a risk that payment by the Buyer for any invoiced amount under the Contract may be delayed and/or confiscated by any bank, financial institution, regulator or governmental entity, the Seller shall be entitled to:
      (i) terminate the Contract without liability; or
      (ii) change the currency of the Contract to a currency other than United States Dollars, with the applicable currency conversion rate to be set by the Seller in its sole discretion.
   e) The Seller shall not be obliged to perform any obligation otherwise required by the Contract including any obligation to perform, deliver, accept, sell, purchase, pay or receive monies to, from, or through a person or entity, or engage in any



other acts if this would be in violation of, inconsistent with, or expose the Seller to punitive measures under, any Trade Sanctions.

f) The Buyer shall indemnify and hold the Seller harmless for non-compliance by the Buyer or the Vessel of this clause 18.

## 19. ANTI-BRIBERY AND ANTI-CORRUPTION

a) The Buyer warrants and undertakes that it shall:
   (i) comply with all applicable laws, statutes, regulations, rules, codes and official government orders relating to anti-bribery and anti-corruption including requirements of the United Kingdom and the United States of America;
   (ii) comply with such anti-bribery and anti-corruption policies as the Seller may update from time to time (and which the Seller shall make available to the Buyer upon request);
   (iii) not, directly or indirectly pay, offer, give or promise to pay or authorise the payment of, any monies or other things of value to:
      a. any government official;
      b. any director, officer, employee, or agent/representative of an actual or prospective counterparty, supplier or customer of the Seller; or
      c. any other person, individual or entity at the suggestion, request or direction or for the benefit of any of the above-described persons and entities, or engage in other acts or transactions, in each case if this is in violation of or inconsistent with the anti-bribery or anti-money laundering legislation of any government including the U.S. Foreign Corrupt Practices Act, the UK Bribery Act 2010, Anti-terrorism, Crime and Security Act 2001, the Money Laundering Regulations 1993 and the Proceeds of Crime Act 2002 and the applicable country legislation implementing the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

b) The Seller may terminate the Contract and any and all other contracts between the Buyer and the Seller in its sole discretion if:
   (i) in its reasonable judgment the Buyer is in breach of any of the warranties or undertakings in clause 19(a); or
   (ii) the Buyer fails to provide satisfactory evidence (in the form prescribed by the Seller in its absolute discretion) of compliance with this clause 19 upon written request by the Seller to the Buyer.

## 20. JURISDICTION AND GOVERNING LAW

a) The Contract and any non-contractual obligations arising out of or in connection with the Contract shall be governed by and construed in accordance with English law.

b) Any dispute arising out of or in connection with the Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof for the time being in force. The arbitration proceedings shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced. Unless the parties agree upon a sole arbitrator, the arbitration reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within fourteen (14) days of that notice, and stating that it will appoint its arbitrator as sole arbitrator unless the other party fails to appoint its own arbitrator and gives notice that it has done so within the fourteen (14) days specified. If the other party fails to appoint its arbitrator or give notice that it has done so within the fourteen (14) days specified the party referring the dispute to arbitration may, without any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of the sole arbitrator shall be binding on both parties as if the sole arbitrator had been appointed by agreement.

c) In cases where neither the claim nor any counterclaim exceeds the sum of one hundred thousand US Dollars (US$100,000) (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association current at the time when arbitration proceedings are commenced.

d) The arbitration agreement in this clause 20 is wholly without prejudice to the Seller's rights to:
   (i) take any action, including commencing any proceedings, against the Buyer, the Vessel or the Vessel's registered owner in any jurisdiction to obtain, maintain and/or enforce security for any claim under the Contract; or
   (ii) commence and/or continue proceedings against the Buyer in any jurisdiction in order to determine the substantive merits of any claim under the Contract.

e) In respect of any legal action or proceedings commenced under clause 20(d), the Buyer hereby irrevocably consents to the service of process by registered post to the Buyer's registered address. Nothing in this clause 20(e) shall affect the Seller's right to serve process in any other manner permitted by law.



21. **MISCELLANEOUS**

   a) No waiver by either party of any provision, right, remedy or breach of the Contract shall be binding unless made expressly and confirmed in writing by both the Buyer and the Seller. Any such waiver shall relate only to such matter, non-compliance or breach as it expressly relates to and shall not apply to any subsequent or other matter, non-compliance or breach.

   b) The Buyer shall not assign the Contract or any of its rights and obligations under it without the express consent in writing of the Seller.

   c) If any provision under the Contract is or becomes illegal, invalid or unenforceable, in any respect, under the law of any relevant jurisdiction, neither the legality, validity nor enforceability of the remaining provisions of the Contract shall be in any way affected or impaired thereby. The parties undertake to replace any illegal, invalid or unenforceable provision with a legal, valid and enforceable provision which comes as close as possible to the invalid provision as regards to its economic intent.

   d) The parties do not intend that any third party shall have any rights under or be able to enforce the Contract, and the parties exclude to the extent permitted under applicable law any such third party rights that might otherwise be implied.

   e) If the Buyer is seeking to purchase any Marine Fuels free of any taxes or duties, the Buyer shall provide the Seller with all valid documentation required by the relevant authorities in conjunction with such tax exemption (including but not limited to any exemption certificate or re-sale certificate for such purchase) as soon as they are available or immediately after the date of Completion and in any case, no later than by the Seller's invoicing time (unless otherwise agreed by the Seller in writing). If the Buyer: (i) fails to comply with its obligations under this clause 21(e); (ii) or consumes any of the Marine Fuels in territorial waters it shall indemnify the Seller for all amounts (including any taxes) incurred by the Seller to any relevant authority as a result of such actions.

   f) On termination of the Contract, the following clauses shall continue in force:
      a. clause 3 (Nomination)
      b. clause 6 (Requests to Amend Delivery and Cancellation);
      c. clause 11 (Health, Safety and the Environment);
      d. clause 12 (Liability);
      e. clause 16 (Notice);
      f. clause 18 (Sanctions Compliance);
      g. clause 20 (Jurisdiction and Governing Law); and
      h. clause 21 (Miscellaneous).

22. **LUBRICANTS**

   a) Where the Buyer is buying mineral or synthetic lubricating oils or greases from the Seller ("**Lubricants**"), the clauses found in Annex A to these Terms and Conditions ("**Annex A**") shall also apply and shall supplement and amend these Terms and Conditions. In the event of any inconsistencies between the Terms and Conditions and Annex A, the terms of Annex A shall prevail.

   b) Where a Contract is agreed for Lubricants and Marine Fuels derived from crude oil, Annex A shall only apply to the sale of Lubricants.



## ANNEX A RELATING TO THE SUPPLY OF LUBRICANTS

### 1. DEFINITIONS

"**Delivery by Bulk**" means a delivery of Marine Fuels to the Vessel by delivery hose under a Contract.

"**Delivery by Container**" means a delivery of Marine Fuels to the Vessel or to the Buyer's other nominated vehicle by pail, drum, barrel, intermediate bulk container (IBC) or other suitable container under a Contract.

### 7. DELIVERY

A new clause 7(k) shall apply as follows:

k) In respect of a Delivery by Container, unless otherwise agreed between the parties, the Physical Supplier shall deliver the Marine Fuels as close to the Vessel as is reasonably possible (in the Physical Supplier's opinion).

### 8. MEASUREMENT, QUANTITY AND TOLERANCE

A new clause 8(a) shall apply as follows:

a) Subject to any mandatory requirements at the delivery location, the Physical Supplier (or its representative) shall take measurements of the volume and calculations of the quantity of each grade of the Marine Fuels delivered ("**Measurements**"), and such Measurements shall (in the absence of fraud or manifest error) be final and binding on the parties of the quantity delivered. The Buyer, the Vessel or their representatives shall be entitled to witness such Measurements. For any Delivery by Container, the Buyer or its representative shall also be entitled to check the packaging, weights and measures of the Marine Fuels at the time of delivery.

### 9. SAMPLING AND QUALITY

Clause 9(a) shall be amended and restated as follows:

a) The Marine Fuels shall conform to the specification or description set out in the Confirmation. For any Delivery by Container, this clause constitutes the whole of Seller's and the Physical Supplier's obligations with respect to the quality of the Marine Fuels. No samples shall be taken by the Physical Supplier.

For Delivery by Bulk, the Physical Supplier shall take and retain a representative sample of the Marine Fuels from the original supply tank (the "**Retained Sample**"), (the "**Sampling Procedure**").

### 10. RISK AND TITLE

Clause 10(a) shall be amended and restated as follows:

a) In respect of any Delivery by Bulk, risk in the Marine Fuels shall pass from the Seller to the Buyer as the Marine Fuels pass the last permanent flange connecting the Barge, Road Vehicle or other delivery facility manifold with the Vessel. In respect of any Delivery by Container, risk in the Marine Fuels shall pass to the Buyer as follows:
   (i) if delivering by Road Vehicle on land, when the Marine Fuels are placed on the ground by the Physical Supplier at the delivery location;
   (ii) if delivering to the Buyer's road vehicle using the Physical Supplier's lifting equipment or personnel, when the Marine Fuels are placed onto the Buyer's road vehicle;
   (iii) if delivering by Road Vehicle to the Buyer's road vehicle using the Buyer's lifting equipment or personnel, when the Marine Fuels are lifted from the Road Vehicle;
   (iv) if delivering by a Barge using the Barge's lifting equipment or personnel, when the Marine Fuels are landed on the deck of the Vessel; and
   (v) if delivering by Barge using the Vessel's lifting equipment or personnel, when the Marine Fuels are lifted off the deck of the Barge.